## CONTINENTAL SUPPLY CO. v. ADAMS et al. (No. 10901.)

(Court of Civil Appeals of Texas. Fort Worth. Jan. 17, 1925. Rehearing Granted April 4, 1925. Rehearing Denied, May 2, 1925.)

1. **Appeal and error ⬤⇒917(1)—Allegations of fact in petition to which general demurrer sustained taken as true.**

As against general demurrer to plaintiff's petition, which was sustained by trial court, all allegations of fact contained in such petition must be taken as true.

2. **Joint-stock companies and business trusts ⬤⇒15(1)—Provisions in declaration of trust organizing syndicate, as to liability of members not binding on third parties.**

As between parties to a declaration of trust by which a syndicate was organized, provisions in such declaration as to liabilities of members thereof are binding, but as to a creditor of such syndicate, who was not a party to the declaration, such provisions were not binding on him.

3. **Joint-stock companies and business trusts ⬤⇒15(1)—Recording of declaration of trust creating syndicate held not constructive notice to creditor of its contents.**

There being no statute requiring recordation of a declaration of trust creating a syndicate, filing of such declaration in deed records of county was not constructive notice to a creditor of such syndicate of its contents.

4. **Joint-stock companies and business trusts ⬤⇒15(1)—Term "trustees" in declaration of trust creating syndicate held ineffective as against creditor of syndicate not bound by declaration.**

The use of the term "trustees" in a declaration of trust creating a syndicate did not change the true relation of persons designated as such, nor fix their legal status as trustees

instead of as partners, as against a creditor of the syndicate, who was in no sense a party to the declaration nor bound by its terms, especially where debt was incurred in name of syndicate as members specifically directed should be done.

**5. Joint adventures ⊚⟿7—Member of syndicate individually liable for debts.**

A member of a syndicate is individually liable for its debts.

**6. Joint-stock companies and business trusts ⊚⟿15(1)—Massachusetts trust usually joint-stock association, members of which are liable on judgment rendered against association where citation served on such members.**

A Massachusetts trust is usually nothing more nor less than a joint-stock association, which under Rev. St. art. 6149, is given authority to sue and be sued in its company name, and, under article 6153, judgment rendered against the association is equally binding on individual property of members served with citation.

**7. Joint-stock companies and business trusts ⊚⟿15(1)—Members of syndicate created under declaration of trust held individually liable for its debts.**

Members of syndicate, doing business under a declaration of trust for purpose of drilling oil wells, under which all members, including trustees, were entitled to certain proportion of profits, and were likewise to participate in losses, and which to all outward appearances was either a corporation, or limited partnership, or joint-stock company, held individually liable to creditors, not parties to declaration of trust, and not bound thereby, for debts incurred by syndicate, especially in view of Acts 37th Leg. (1921), c. 73, §§ 1, 3 (Vernon's Ann. Civ. St. Supp. 1922, arts. 5950½, 5950½b), and section 6 (Vernon's Ann. Pen. Code Supp. 1922, art. 1007c), and Acts 38th Leg. 2d Called Sess. c. 52.

Buck, J., dissenting.

Appeal from District Court, Stephens County; C. O. Hamlin, Judge.

Action by the Continental Supply Company against G. T. Adams and others. Judgment for defendants, and plaintiff appeals. Reversed and remanded.

Hawkins, Hawkins & David, of Breckenridge, for appellant.

John W. Mackey, of Breckenridge, and E. F. Ritchie, for appellees.

BUCK, J. The Continental Supply Company filed suit for debt against G. T. Adams, W. R. Powers, and Mrs. Cynthia Creagh, and other parties subsequently dismissed. Plaintiff's petition alleged that the defendants associated themselves together in an organization known as the Man O' War Oil Syndicate, and that each member of said association received certificates issued by the duly authorized agents of the association indicating their respective membership there-

in; that said association was organized under a so-called declaration of trust, which was on file in the deed records of Stephens county, referring to volume and page of the record, "and a certified copy of said declaration of trust is hereto attached and marked Exhibit A, and hereto referred to for all necessary purposes." It was further pleaded that the members of the association had appointed certain named persons as "their trustees and agents, with power to manage the business of the members of the said organization known as the Man O' War Oil Syndicate; that, said defendants * * * having become members of said organization, and under and by virtue of the said declaration of trust" the defendants jointly and severally constituted the said named trustees the agents of each of them in the management of the affairs of the association.

It was alleged that theretofore on May 12, 1921, while the defendants were members of the said association, and S. S. Shelby, one of the named trustees, doing business under the name of the Black Hawk Drilling Company, and H. L. Hendrick, the defendants became indebted to plaintiff on account of certain well supplies furnished by plaintiff to the defendants and used by them in the drilling of a well, and that in settlement of said open account the Man O' War Oil Syndicate and the Black Hawk Drilling Company, both as principals, executed and delivered to plaintiff their promissory note, in the principal sum of $2,085.88, payable in 60 days after date, etc.; that H. L. Hendrick duly guaranteed the payment of said note by indorsing his name thereon. It was further alleged that when said note became due, payment was refused, and said note was protested. It was further alleged that the Man O' War Oil Syndicate, and the trustees thereof, were notoriously insolvent, as was also H. L. Hendrick and S. S. Shelby, and the residences of the persons named unknown.

In the alternative, plaintiff pleaded:

"Plaintiff further alleges, in the alternative, that if it be mistaken in its allegation that the defendants became parties of the said organization known as the Man O' War Oil Syndicate, and if the defendants were not principals with said agents acting as above alleged, then and in that event the defendants, and each of them, were partners doing business under the said trade name of Man O' War Oil Syndicate and that the said S. S. Shelby acted as their duly authorized agent in executing said note herein sued upon and that the said defendants, and each of them, are jointly and severally liable to plaintiff for the payment of the full amount of said note together with interest thereon."

The declaration of trust attached to the petition, and asked to be considered therewith, is signed by the four named trustees, to wit, L. B. Lucius, W. D. Lucius, S. S.

---

⊚⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Shelby, and S. M. Trent. It provides that Mrs. Belle Lucius, otherwise known as L. B. Lucius, is the owner of a leasehold interest in a 40-acre tract of land in Stephens county; that by the deed of assignment to her there was conveyed a thirteen-sixteenths interest in all the oil, gas, and other minerals in and under said tract, reserving to the grantors three-sixteenths of such oil, gas, and other minerals. It was further provided that Mrs. Belle or L. B. Lucius conveyed and assigned to the trustees, including herself, all her right, interest, and title to said leasehold interest; that the named persons do declare themselves as trustees of the association to be formed, to be known as the Man O' War Oil Syndicate, and that they should "own, hold and administer the said property and the said trust in the manner and for the purposes thereinafter stated." The declaration of trust provided that the trustees in their collective capacity should be known as the Man O' War Oil Syndicate, and in said name they should hold, manage, control, and operate the wells to be drilled on the 20 acres; that said trustees should cause to be drilled two wells on the tract, and the output of said wells should be run into pipe lines, and after the payment of the three-sixteenths royalty to the owner of the lease, 25 per cent. of the remainder should be reserved by the trustees for the purpose of paying the expenses of development and operation, and 75 per cent. should belong to the purchasers and owners of unit certificates; that there were to be 1,500 units of par value of $100 each, and each unit holder should be entitled to one-fifteenth hundredth of the said 75 per cent. of the oil and gas produced on the tract, evidently after the royalty had been paid. It was further provided that:

"The trustees, by the issuance of the said certificates, shall not undertake nor bind themselves nor their successors nor assigns to deliver to the holders of such certificates any specific amount of oil, gas, or other minerals, or to pay any specific amount of money or other thing of value, nor to pay any dividends; but the said certificates shall only represent a conveyance or assignment by the said trustees of a certain proportion of such oil, gas, or other minerals as may be produced and marketed from the said 20 acres of land, as set out in paragraph 6 hereof. And there shall be no liability against the said trustees, or any or either of them, or any of the unit or certificate holders, by reason of a failure to produce oil or gas from the said tract of land; it being understood that by the issuance of the said certificates the said trustees only bind themselves that they are the owners and holders of thirteen-sixteenths of the oil, gas, and other minerals in, under, and upon the said land; that they will in good faith drill or cause to be drilled at least two wells thereon for the production of oil, gas, and other minerals, as herein provided; that the proportion of such products, whether much or little, as represented by the said units or certificates, shall be delivered in the pipe line for the respective owners and holders thereof; and that the said trustees will not issue in excess of 1,500 units of $100 each against the said 75 per cent. of the gross product of the wells to be drilled on said land."

It was further provided that, in the event of the death of, or total disability of, one of said trustees, all of the rights, powers, and duties originally conferred upon the four should vest absolutely in the survivors, and all vacancies should be filled by the remaining trustees. It was specially provided that:

"The trust hereby created shall not be considered in any sense as either a copartnership or a joint-stock association, nor shall the certificates to be issued by the trustees hereunder be considered or treated as shares of stock, nor as entitling the holders thereof to any profits or dividends out of the funds of said trust, but the same are and intended to be absolute conveyances of a definite and fixed proportion of such oil, gas, and other minerals which may be produced from the said tract of land, whether same be much or little."

It was further provided in the declaration that after the two wells stipulated should be drilled, and after the issuance and delivery of the certificates of units of stock therein provided, the trustees might at their discretion terminate the trust, and evidence their intention so to do by filing and recording their declarations to that effect in the office of the county clerk of Stephens county.

The defendants filed, on November 7, 1922, an unverified answer consisting of a general demurrer and a general denial. On April 9, 1923, they filed their first amended answer, duly verified, in which they especially denied that either of them had authorized the named trust to act as their agents to conduct the business of the Man O' War Oil Syndicate for them, or that they had executed or signed the note sued on, or that same was signed by any person authorized so to do for them, and especially denied a partnership with any of the trustees, and with any of the other defendants named, or with the Black Hawk Drilling Company, or the Man O' War Oil Syndicate, and denied that they had ever authorized such persons or associations to do any business or to bind them in any way. On January 4, 1923, defendants filed their motion for a continuance, and on January 6th said motion was sustained. On March 9th defendants demanded and were granted a jury, and on April 9, 1923, were granted leave to file their amended answer, and a second continuance was granted them. On June 11, 1923, a third application by defendants for continuance was overruled. On September 28, 1923, plaintiff dismissed its suit as to defendants other than the defendants heretofore named, and sustained the general demurrer of defendants Adams and Powers, and, plaintiff

declining to amend, the court rendered judgment that plaintiff take nothing as to defendant Mrs. Cynthia Creagh. Plaintiff has appealed.

The main complaint on this appeal is that the trial court failed and refused to grant plaintiff below an interlocutory judgment foreclosing any right of the defendants to make any defense to said note, and granting plaintiff's recovery contingent only upon its compliance with the duty to prove the material averments of its petition. This motion for judgment was filed March 9, 1923. The only answer at that time filed consisted of a general demurrer and a general denial, unverified. On the same day on which the motion was made and overruled, the defendants demanded a jury, and the same was granted. The record does not disclose whether the demand for a jury was made before the motion for judgment was filed or not. If the affirmance of the court's action in overruling the motion for judgment depended on the demand for a jury being made and granted prior to the filing of a motion, it might be contended that we should presume in favor of the judgment that the demand for the jury had been made and granted before the motion for a judgment had been filed or presented to the court. But we are inclined to think that it was immaterial as to whether the demand for a jury was made or the motion for judgment was presented first. We think that the petition of plaintiff, taken as a whole, viewed in connection with the declaration of trust attached thereto and made a part thereof, shows that plaintiff's cause of action, if any, against defendants, appellees here, is based on the theory that defendants, as purchasers of certificates of units of stock in the Man O' War Oil Syndicate became partners with each other and with the other stockholders, including the trustees of said association. As will be noted, the holders of such certificates had no part in the election of the trustees, nor any part in the management of the affairs of the association. By the terms of the articles of the declaration of trust, the trustees appointed themselves, and said articles especially provided that, in case of a vacancy in the designated trustees, the survivors only had authority to fill such vacancy. Apparently the stockholders were without any authority in the management of the affairs of the organization. The only right that the owners of the units of the stock had was to demand that they be given their due portion of the oil after it had been extracted from the ground and was in the pipe lines, and to receive pay therefor.

In Fisheries Co. v. McCoy, 202 S. W. 343, the Court of Civil Appeals at San Antonio followed the Massachusetts test and held that the association was a partnership because of the declaration of trust; the stockholders reserving the right "to transact other business at the annual meetings than the election of trustees." A writ of error was granted in this case, but we have not found that the Supreme Court has decided the case.

In McCamey v. Hollister, 241 S. W. 689, this court held that the shareholders were liable, because they had the right (1) to hold annual meetings; (2) to instruct the trustees; (3) to audit the books; and (4) to amend the declaration of trust. The majority in that case held that under our laws the pure Massachusetts trust with immunity to its shareholders was impossible, the writer dissenting. The Supreme Court has not yet decided that case. In Oil Lease & Royalty Co. v. Beeler (Tex. Civ. App.) 217 S. W. 1054, Geiselman v. Anderson (Tex. Civ. App.) 242 S. W. 800, Howe v. Wichita Bank (Tex. Civ. App.) 242 S. W. 1095, Morehead v. Greenville Bank (Tex. Civ. App.) 243 S. W. 546, Hardee v. Adams Oil Ass'n (Tex. Civ. App.) 254 S. W. 602, Webster v. Utopia Confectionery (Tex. Civ. App.) 254 S. W. 123, the associations were all held not to be pure Massachusetts trusts, by reason of the fact that shareholders had a part in the management of the business of the association or in the election of the trustees. See West Side Oil Co. v. McDorman (Tex. Civ. App.) 244 S. W. 167; Bingham v. Graham (Tex. Civ. App.) 220 S. W. 105; Davis v. Hudgins (Tex. Civ. App.) 225 S. W. 73; Nini v. Cravens & Cage (Tex. Civ. App.) 253 S. W. 582.

In Wells v. Mackay Telegraph Co., 239 S. W. 1001, the Galveston Court of Civil Appeals held that the shareholders were jointly and severally liable for the debts incurred by the trustees in the conduct of the business of the association. This case has gone as far as any other Texas case, including McCamey v. Hollister Oil Co., supra, in holding the shareholders liable for the debts of the association, and even in this case the grounds for the holding are stated as follows:

"In the instant case the purpose for which the trust was created was conducting a business for the profit of the shareholders, the buying, selling, and developing of oil lands and the refining of oil. Any profits made in carrying on this business would come to the shareholders in the form of dividends upon or in the increased value of their shares. It seems to us that this character of a trading concern for profit comes within the purview of our statute, which declares that 'any unincorporated joint-stock company or association' doing business in this state may be sued without making the individual stockholders parties," etc.

In the case of Phœnix Oil Co. v. McLarren, 244 S. W. 830, this court held, in effect, that the organization there involved was "a pure trust," and not a partnership, because "the trustees have the absolute control and management of the company's business and affairs, without reservation of such right in the shareholders; such shareholders have

no authority in themselves to remove the trustees, or to elect successors."

In our opinion, the petition does not allege a state of facts which would make the defendants below liable for the payment of the note sued on, and therefore the judgment of the trial court is in all things affirmed.

DUNKLIN, J., absent and not sitting.

### On Motion for Rehearing.

DUNKLIN, J. This suit was by the Continental Supply Company against G. T. Adams, W. R. Powers, and Mrs. Cynthia Creagh, and other parties who were later dismissed, as members of an association known as the Man O' War Oil Syndicate, for debt jointly and severally incurred by the association and S. S. Shelby, doing business in the name of Black Hawk Drilling Company, on a promissory note executed by the association and S. S. Shelby in settlement of an account for well supplies alleged to have been sold to defendants by the plaintiff, and used by defendants in drilling an oil well belonging to the Man O' War Oil Syndicate. It was alleged in plaintiff's petition that the defendants were stockholders in the Man O' War Oil Syndicate, an association which had become notoriously insolvent, and that S. S. Shelby and one Hendrick, who guaranteed the payment of the note, and the trustees named in the articles of association designated as a "Declaration of Trust," were all notoriously insolvent, and that their residences were unknown. It was further alleged that the defendants were liable to plaintiff for the debt as partners, also as stockholders or members of the association, and as principals by reason of the fact that the trustees named in the instrument who incurred the debt did so as defendants' agents.

The trial court sustained a general demurrer to plaintiff's petition and dismissed the suit; and plaintiff has appealed from that order.

A copy of the "Declaration of Trust," upon which liability of the defendants was predicated, was attached to plaintiff's petition as an exhibit and made a part of it. That document reads as follows:

"The State of Texas, County of Tarrant:

"This declaration and agreement witnesseth:

"That whereas, Mrs. Belle Lucius (who is the same person as L. B. Lucius, one of the signers hereof) is the owner of a leasehold upon 40 acres of land, being the southwest quarter of the northeast quarter of section No. 8, block No. 5, of the Texas & Pacific Railway Company lands in Stephens county, Tex., as evidenced by a deed of assignment executed by the Walker-Caldwell Producing Company, bearing date the 2d of October, 1920, and recorded or to be recorded in the office of the county clerk of Stephens county, Tex.; and

"Whereas, the said deed of assignment conveyed to the said Mrs. Belle Lucius thirteen-sixteenths of all the oil, gas, and other minerals upon, in or under the said tract of land, together with the right of ingress and egress over, through, and upon the said land for the purpose of drilling for, producing and marketing the said oil, gas, or other minerals, and reserving to the said grantors and their assigns the remaining three-sixteenths of such products as royalties; and

"Whereas, it is provided by the deed of assignment referred to, and is the intent and purpose of the said Mrs. Belle Lucius (herein signed as L. B. Lucius) that the said land shall at once be developed and drilled for the production of oil, gas, and other minerals, by the drilling of wells thereon:

"Therefore, it is hereby agreed and declared by the said L. B. Lucius, of Stephens county, Tex., W. D. Lucius of Parker county, Tex., S. S. Shelby and S. M. Trent of Tarrant county, Tex., as follows:

"First. That for and in consideration of $1 to her in hand paid, the receipt of which is hereby acknowledged, and for and in consideration of the covenants and agreements herein contained, the said L. B. Lucius has assigned, transferred, conveyed, and set over, and does hereby assign, transfer, convey, and set over, unto the said L. B. Lucius, W. D. Lucius, S. S. Shelby, and S. M. Trent, as trustee for the purposes hereinafter mentioned all of her right, title, claim, and interest in the above-described lease, in so far as the same covers and applies to the east half of the southwest quarter of the northeast quarter of said section 8 of block 5 of the Texas & Pacific Railway Company lands in Stephens county, Tex., the portion hereby assigned containing 20 acres.

"Second. That the said L. B. Lucius, W. D. Lucius, S. S. Shelby, and S. M. Trent are hereby declared to be trustees, for themselves and for all others who may become interested herein by the purchase of units of certificates of beneficial interest in the trust hereby created, and that they will own, hold, and administer the said property and the said trust in the manner and for the purpose hereinafter stated.

"Third. That the said trustees in their collective capacity shall be known as the Man O'War Oil Syndicate, and, in such name they shall as such trustees hold, manage, control, and operate the wells to be drilled on the said 20 acres of land, and in such name conduct the business pertaining to the same.

"Fourth. That the said L. B. Lucius is hereby declared to be president, and the said S. M. Trent secretary and treasurer, of the said trust. The domicile and principal office of the said trustees shall be at Breckenridge, in Stephens County, Tex.

"Fifth. That the said trustees will, in accordance with the terms of the said deed of assignment from the Walker-Caldwell Producing Company, drill or cause to be drilled two wells to be drilled on the said 20-acre tract of land herein assigned to them, said wells to be drilled to a depth of not less than 3,500 feet unless oil or gas should be found at a lesser depth, and that, in the event that oil or gas is found thereon, the same will be run into pipe lines for marketing and for distribution as hereinafter set forth.

"Sixth. The entire product of the said two wells, and of any other wells which may be drilled upon the said 20 acres, shall be run

into the pipe line or lines which may be connected with said wells, and after the payment of the three-sixteenth royalty to the owners of the fee title to said land, as provided by the terms of the said assignment of lease, 25. per cent. of the remainder shall be set aside and reserved by the said trustees for the purpose of paying the expenses of development and operation of the lease on the said 20 acres, and 75 per cent. thereof shall belong to the purchasers and owners of the unit certificates hereinafter mentioned. The said 75 per cent. of said products shall be divided into 1,500 units of the nominal or par value of $100 each; and the said trustees shall forthwith issue, or cause to be issued, certificates or instruments of conveyance to the subscribers hereto and to all such other persons as shall hereafter become subscribers to or applicants for said units or shares, upon their paying therefor the sum of $100 for each of such units or shares subscribed or applied for. Each of the said units shall entitle the owner and holder of the certificates therefor to one fifteen-hundredth part of the said 75 per cent. of all the oil, gas, and other minerals produced and marketed from the wells which may be drilled upon the said 20 acres of land herein referred to. The certificates to be issued by the said trustees shall be duly executed and acknowledged by the president and attested by the secretary of the said Man O' War Oil Syndicate, and shall be an absolute assignment and convenience of a one fifteen-hundredth part of the said 75 per cent. of all oil, gas, and other minerals produced from the said 20 acres of land, for each $100 unit or share represented by the said certificate of conveyance, and such certificates shall authorize the pipe line company taking such products to be delivered the same or the proceeds thereof to the respective holders of such certificates, in the proportions shown by said certificates.

The secretary shall keep a correct record of all certificates issued, and such certificates shall only be transferable on the books of the trustees, and upon the authority of an instrument of assignment duly executed and acknowledged by the owner thereof.

"Eighth. The trustees, by the issuance of said certificates, shall not undertake nor bind themselves nor their successors nor assigns to deliver to the holders of such certificates any specific amount of oil, gas, or other minerals or to pay any specific amount of money or other thing of value, nor to pay any dividends; but the said certificates shall only represent a conveyance or assignment by the said trustees of a certain proportion of such oil, gas, or other minerals as may be produced and marketed from the said 20 acres of land, as set out in paragraph 6 hereof. And there shall be no liability against the said trustees or any or either of them, or any of the unit or certificate holders, by reason of a failure to produce oil or gas from the said tract of land; it being understood that by the issuance of the said certificates the said trustees only bind themselves that they are the owners and holders of thirteen-sixteenths of the oil, gas, and other minerals in, under and upon the said land; that they will in good faith drill or cause to be drilled at least two wells thereon for the production of oil, gas, and other minerals, as herein provided; that the proportion of such prod-

ucts, whether much or little, as represented by the said units or certificates, shall be delivered in the pipe line for the respective owners and holders thereof; and that the said trustees will not issue in excess of 1,500 units of $100 each, against the said 75 per cent. of the gross product of the wells to be drilled on said land.

"Ninth. In the event of the death or total disability of one of the said trustees during the continuance of this trust, all of the rights, powers, and duties herein conferred upon the four shall be vested absolutely in the survivor, all vacancies in the office of trustee shall be filled by the remaining trustees.

"Tenth. All business pertaining to the trust hereby created, in the conduct and operation of the said lease on 20 acres herein referred to shall be conducted by the said trustees under the name of the Man O'War Oil Syndicate.

"Eleventh. The secretary shall keep an accurate record of the business of the said trust, shall attest, by countersigning, all certificates for units issued by or under the direction of the trustees, shall keep a correct record of the number of such certificates, to whom issued, and the number of units represented thereby, and all transfers and assignments of units shall be recorded by said secretary.

"Twelfth. The trust hereby created shall not be considered in any sense as either a copartnership nor a joint association, nor shall the certificates to be issued by the trustees hereunder be considered or treated as shares of stock, nor as entitling the holders thereof to any profits or dividends out of the funds of said trust, but the same are and intended to be absolute conveyances of a definite and fixed proportion of such oil, gas, and other minerals which may be produced from the said tract of land. whether same be much or little.

"Thirteenth. After the drilling of two wells upon the said tract of land in accordance with this agreement, in the event it should be determined to drill no other or further wells thereon, and after the issuance and delivery by the said trustees of the certificates or conveyances of units herein provided for, evidencing and fixing the respective interests of the unit holders in the products of the wells on the said land, and thereby completing the performance of the trust hereby created, the said trustees may at their discretion terminate this trust by the filing and recording of a declaration to that effect in the office of the county clerk of Stephens county, Tex., and upon the filing of such declaration this trust shall at once be ended and dissolved, and there shall be no liability in favor of any certificate holder or other person against the said trustees, either individually or as a trustee, other than set out in said certificates, except for willful default or for malfeasance. If not terminated in the manner provided, this agreement shall be in force for a period of 5 years from its date.

"Fourteenth. This declaration shall be recorded in the office of the county clerk of Stephens county, Tex., as notice to all persons of the intent and purpose hereof.

"In witness whereof the said parties have hereunto set their names on this the 7th day of October, A. D. 1920.     L. B. Lucius.
                                  "S.  S.  Shelby.
                                  "S. M. Trent.
                                  "W. D. Lucius."

[1] As against the general demurrer to the petition, which was sustained by the trial court, all of the allegations of fact therein contained must, of course, be taken as true; and the facts alleged, including those shown in the articles of association, will hereinafter be stated as facts.

[2] In the determination of the issues involved, it is important to keep in mind the fact that, as between the parties thereto, the written agreement is doubtless binding, but that the plaintiff in this suit is not a party to the instrument, and the same did not become in any manner a part of the contract of sale of the well supplies to the Man O' War Oil Syndicate. It should also be kept in mind that the contract of purchase and the note sued on were both in the name of the syndicate and not in the names of the "trustees"; that plaintiff did not expressly agree to an exemption of the stockholders from liability for the debt; and that in the third paragraph of the agreement it was provided that the trustees should in their collective capacity be known as the Man O' War Oil Syndicate, and by paragraph 10 the trustees were authorized and required to conduct all business contemplated by the agreement in the name of the Man O' War Oil Syndicate.

[3] Furthermore, as there is no statute in this state authorizing or requiring the recordation of such an agreement in any of its public records, the filing of the same in the deed records of Stephens county was not constructive notice to plaintiff of its contents. Nor does it appear from the petition that plaintiff had actual notice of said agreement prior to or at the time it sold the well supplies to said syndicate.

As shown by said agreement, L. B. Lucius, W. D. Lucius, S. S. Shelby, and S. M. Trent, named as trustees therein, were to receive 25 per cent. of all the remainder of oil after paying three-sixteenths of such oil as a royalty to the owners of the fee-simple title to the land. And the remaining three-fourths of three-sixteenths of said oil was to be turned over to the holders of unit certificates to be issued by the trustees. The number of unit certificates was to be 1,500, and were to be sold for $100 each, aggregating $150,000.

The only obligation undertaken by the trustees was to drill or cause to be drilled two wells to a depth of not less than 3,500 feet, unless oil or gas should be found at a lesser depth, and to run the oil in pipe lines for marketing and distribution. With the money realized from the sale of the unit certificates, the trustees were authorized to drill two wells and make the pipe line connections. If the proceeds from the sale of stock were insufficient to drill those two wells and make the pipe line connections, then the trustees were under a legal obligation to furnish the balance of the money required.

[4] If the cost of drilling the first two wells and making the connections should be less than the $150,000 realized from the sale of stock certificates, and if, after drilling those wells, the trustees should decide not to drill other wells, then by paragraph 13 they would have the right to terminate the trust without incurring any liability to the certificate holders for any balance remaining in their hands. And if the first two wells should produce oil in paying quantities, and the cost of drilling them and running the oil in the pipe lines did not exceed the amount realized from the sale of certificates of stock, then the trustees would without cost to them realize 25 per cent. of the profits over and above the royalty interest of three-sixteenths of the oil to the owner of the fee, as against 75 per cent. to all the certificate holders who contributed the entire cost of drilling, the only financial obligation assumed by the trustees being, as shown in the fifth paragraph of the agreement, to make up the balance, after exhausting the $150,000, that might be required to drill two wells and to run the oil in the pipe lines; all of which shows that the undertaking of the trustees was for profit to themselves individually from the oil produced, and not merely to earn wages for services rendered, as in case of an ordinary trust, and, further, that apparently they were on a more favorable basis for realizing profits than the holders of certificates. The designation of the certificates as "unit certificates" did not change their real character; they were essentially certificates of stock in the association in spite of that designation. And the receipt by the certificate holders and the trustees of certain interests in the oil rather than the proceeds of the sale thereof would not make the oil so received any the less profits. Nor did the use of the term "trustees" change the true relation of the persons designated as such, and fix their legal status as mere trustees instead of as partners in their transaction with the plaintiff in this case, who was a creditor of the syndicate, and in no sense a party to the written agreement, nor in any manner bound by its terms, especially as the debt was incurred in the name of the syndicate, as the certificate holders specifically agreed and directed should be done in such transactions. It is a maxim that equity looks to the intent rather than to the form, and in 1 Pom. Eq. Jurisprudence, § 378, it is said:

"Equity always attempts to get at the substance of things, and to ascertain, uphold, and enforce rights and duties which spring from the real relations of parties. It will never suffer the mere appearance and external form to conceal the true purposes, objects, and consequences of a transaction."

In the case of Kelley Island Lime & Transport Co. v. Masterson, 100 Tex. 38, 93 S. W. 427, the following was said:

"Downey and Kelley had two contracts with the city of Beaumont for the construction of

paving and sewerage for that city, which it was estimated would yield a profit of $53,000. The city required a bond in a large amount from Downey and Kelley, which they were not able to make. The contractors also needed $17,000 to turn over to the city of Beaumont to enable the city to sell its bonds at par and $10,000 in cash with which to begin operation. Masterson agreed to furnish the bond required by the city, and to furnish or secure the $17,000 necessary to be turned over to the city, also $10,000 cash, and as much more as might be necessary for the completion of the work. Downey and Kelley agreed to give their time and skill to the prosecution of the work and, when all debts were settled and 8 per cent. interest paid to Masterson for the money furnished by him, the net profits, if any, were to be divided by first giving to Masterson $12,500, then to Downey and Kelley $25,000, if there should be so much profit on the contract. If the profits exceeded $37,500, then Downey and Kelley were to receive two-thirds of the excess. To state the facts leads to' the conclusion that Masterson was a partner in that enterprise. Each of them participated in the net profits of the business, and neither of them received it for services rendered as the agent of the other. "This case is distinguishable from Buzard v. Bank. 67 Texas, 83, in these respects: Buzard employed Pennington and furnished him with money to buy cattle, and for his services Pennington was to receive a part of the profits of the business. Pennington was distinctly an agent of Buzard. Masterson put his credit and money into the Beaumont contracts against the skill and services of Downey and Kelley, who proceeded as contractors with Beaumont to construct the work. Downey and Kelley were under no obligation to repay to Masterson the money advanced by him. Masterson took the chances on success for the return of his money and interest thereon. Downey and Kelley were to receive each $100 per month as advances, to be deducted from their share of the profits. Masterson was not to receive his share of the profits as compensation for the use of his money, now were Downey and Kelley to receive their share as payment for services, but each received the profits as fruits of the joint enterprise, that is, as profits, which made them partners."

This was said in Cothran v. Marmaduke & Brown, 60 Tex. 370:

"Both at common law and in equity, where a party by agreement had a right in the entire net profits, which entitled him to a definite share as profits, he was considered a partner. Chester v. Dickinson, 54 N. Y. 1. It is not essential to constitute a partnership that the parties were by agreement to share in the losses, but it is sufficient if they are to have a community of interest in the profits as such. Goode v. McCartney, 10 Tex. 195; Manhattan Brass Co. v. Sears, 45 N. Y. 797. In Story on Partnership, § 58, it is said 'that he who is to take a part of the profits shall by operation of law be made liable to losses as to third persons, because by taking a part of the profits he takes from the creditors a part of that fund which is the security for the payment of their debts.' In determining the question, the court will look to the actual relation consequent upon the engagements of the parties, and in favor of creditors they will ordinarily apply the doctrine that the party who shares in the profits must also bear his share of the liabilities."

Stevens & Andrews v. Gainesville Nat. Bank, 62 Tex. 499, was of like effect.

Chancellor Kent defined a partnership as—

"a contract of two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business; and to divide the profits and bear the loss in certain proportions."

The following is copied from the syllabus of the decision of the Court of Civil Appeals in Roberts v. McKinney, 187 S. W. 976:

"Persons contributing labor, material, and cash to driving an oil well under agreement to incorporate and issue stock in proportion to their contributions, if the well comes in, otherwise each to lose what he puts in, are partners."

The syllabus of the decision of the Supreme Court of Oklahoma, of date March 13, 1923, reported in Barrett v. Buchanan, 95 Okl. 262, 213 P. 734, is in part:

"Where tenants in common co-operate in developing a lease for oil and gas each agreeing to pay his part of the expenses and to share in the profits or losses, they constitute a 'mining partnership.' "

To the same effect is the decision of the Court of Appeals at Amarillo, Peck v. Powell, 259 S. W. 640.

In Miller v. Marx, 65 Tex. 131, W. S. Campbell and Mrs. Miller, a married woman, conducted a mercantile business as partners. It was held that Mrs. Miller could not become a partner in business with any one, but further held that her husband was liable as a partner in the same business to a creditor of the firm, because his wife's share in the profits of the business was community property of the two spouses, the court saying:

"Miller could not enjoy all the advantages of a partnership without bearing its losses and becoming liable for its debts. Had no contract of partnership been signed by his wife, and had she not been known in respect to the partnership affairs in any manner whatever, and yet he had been in a position to demand an interest in the profits of the character we have stated, he would be held as a partner in the concern as to third parties, whether he contributed to the capital stock or not. He certainly cannot enjoy these profits without the corresponding liabilities merely because they are accorded to him by reason of an instrument, which, though void in itself, has been recognized as valid by the party entitled to the remainder of the profits. It is not the validity of the partnership agreement, but the fact that under it a person receives the profits to which a partner is entitled that constitutes him a partner so far as third parties are concerned. Had Miller himself signed articles of partnership with Campbell, which were void and could not be enforced against him by his copartner, but under these articles had regularly reaped his

portion of the partnership sales as provided in the articles, he would have been responsible for the firm debts. Otherwise, any one wishing to share in the profits of a partnership, and at the same time to be exempt from its debts, could effect this object by means of a void partnership agreement, although under it he enjoyed all the advantages of a partner, so far as profits were concerned. We think it clear that. whilst Mrs. Miller was not a member of the firm, her husband was, as to third parties, and that he was therefore liable for the debt upon which this suit is brought."

In Freeman v. Huttig Sash & Door Co., 105 Tex. 560, 153 S. W. 122, Ann. Cas. 1916E, 446, Chief Justice Phillips cites with approval the decisions in Miller v. Marx, 65 Tex. 131, Stevens & Andrews v. Bank, 62 Tex. 499, Kelley Lime & Transport Co. v. Masterson, 100 Tex. 38, 93 S. W. 427, which have been noted above.

In the agreement one of the trustees was appointed president of the Man O' War Syndicate, with power to issue unit certificates to purchasers. Another trustee was appointed its secretary, whose duties included the attestation of the unit certificates which could be transferred only on the books to be kept, and it was provided that all business was to be transacted in the name of the Man O' War Oil Syndicate. Thus the organization was clothed in all the habiliments and outward appearances of either a corporation or limited partnership or joint stock company, all for the purpose of dealing with the public on that basis.

It thus appears from the declaration of trust that it was an association organized for the purpose of drilling oil wells on a certain 20-acre tract of land in Stephens county, Tex. All persons purchasing certificates of membership in the association were thereby entitled to a certain portion of the oil runs or profits derived from such drilling operations. In the event the wells proved to be dry or nonproductive, each member lost the money which he had invested therein. The trustees were investing their labor and efforts and agreeing, in the contingency stated, to invest their capital also, against the capital and money being invested by the various members or certificate holders. If oil was discovered, then each and all were to participate therein in accordance with the proportion set out in the declaration of trust. If no oil was discovered, each and all of the trustees and members of the association participated in the resulting losses.

It follows then that the trustees and certificate holders alike had a joint or community interest in the drilling of the two wells on the said lease, which might have resulted in either gains or losses for each and all alike. The entire business was to be conducted under the name of the Man O' War Oil Syndicate. The very word "syndicate" carries with it the idea of an association or partnership.

"A syndicate * * * is an association of individuals, formed for the purpose of conducting and carrying out some particular business transaction, ordinarily of a financial character, in which the members are mutually interested. It is, as, respects the persons composing it, a partnership." Hambleton v. Rhind, 84 Md. 456, 36 A. 597, 40 L. R. A. 216.

See 3 Bouvier's Law Dictionaries (Rawle's 3d Ed.) p. 3215, the word "syndicate."

The following is quoted from the first paragraph of the syllabus in the case of Oil Lease & Royalty Syndicate v. Beeler, 217 S. W. 1054, Court of Civil Appeals, Dallas, Tex., January 3, 1920:

"Parties constituting members of a voluntary association, as a syndicate, have the legal liabilities, rights, and duties of partners, except there ordinarily is no delictus personæ, and the affairs are usually conducted by managers designated according to the by-laws, and, as the rights of each member are fixed by certificate, the death of a member will not dissolve the association."

[5] A member of a syndicate is individually liable for its debts. Standard Drilling Co. v. Slate (June 6, 1924) 203 Ky. 599, 262 S. W. 969; James v. Stokes (May 9, 1924) 203 Ky. 127, 261 S. W. 868.

Articles of association, attempting to create these so-called "Massachusetts trusts" have been considered and construed by our different Court of Civil Appeals for the purpose of determining whether the members of such "trusts" were individually liable for the debts of the organization. The declaration of trust considered by this court in the case of McCamey v. Hollister Oil Co., 241 S. W. 689, and the declaration of trust considered by the Court of Civil Appeals at Galveston in the case of Wells v. Mackay Telegraph & Cable Co., 239 S. W. 1001, each contained a provision which required the trustees to conduct all business under the trade-name of the association. Furthermore, in each of those so-called trust agreements, the interests of the several members were represented by certificates of membership, transferable only on the books of the association. Those provisions appear in the agreement or declaration of trust now under consideration. Furthermore, in those declarations of trust, as in the present case, the associations were organized for the mutual profit of the members thereof. Likewise the members were to participate in the losses of the business undertaken.

In the case of McCamey v. Hollister Oil Co., supra, the majority of this court held that, in view of the public policy of this state, as reflected by its statutes permitting the formation of private corporations with exemption of stockholders from liability for their debts, also permitting the formation of limited partnerships with limited liability of members for debts of the firm, and chapter 2,

tit. 102, of Revised Statutes, the members of an unincorporated joint-stock company or association organized for profit, although organized under a so-called Massachusetts trust form, cannot escape individual liability to its creditors, regardless of the provisions of its declaration of trust or articles of agreement. The majority of the court still adhere to that conclusion.

[6] A Massachusetts trust is usually nothing more nor less than a joint-stock association which, by article 6149 of our statutes, is given authority to sue and be sued in its company name, and, by article 6153, it is provided that in a suit against such an association citation may also be served on the stockholders or members, and that, in case judgment is rendered against the association, it will be equally binding upon the individual property of the stockholders or members so served.

The same conclusion reached by the majority of this court in the McCamey v. Hollister Case, was reached in the cases of Wells v. Mackay Telegraph-Cable Co. (Tex. Civ. App.) 239 S. W. 1001, Nini v. Cravens & Cage Co. (Tex. Civ. App.) 253 S. W. 582, Harvey Co. v. Braden (Tex. Civ. App.) 260 S. W. 655, Victor Ref. Co. v. City Nat. Bank of Commerce, (Tex. Civ. App.) 263 S. W. 622; and in the case of Nini v. Cravens & Cage Co., just cited, Justice Walker, who rendered the opinion, made an extensive review of the Massachusetts decisions, and shows that in a great majority of the cases there decided the court held that organizations which were in the form of the Massachusetts trust constituted partnerships, and the holders of certificates of stock were held liable as such to the creditors of the so-called trust. In addition to the cases noted by him, may be added the following: Horgan v. Morgan (1919) 233 Mass. 381, 124 N. E. 32, held a partnership; Howe v. Chmielinski et al. (1921) 237 Mass. 532, 130 N. E. 56, held a partnership; Neville v. Gifford (1922) 242 Mass. 124, 136 N. E. 160, held a partnership. In the year 1916, a statute was passed in Massachusetts giving the Massachusetts trust practically the same legal status as a corporation, thus indicating perhaps a recognition of the uncertainty of the legal status of such organizations as theretofore understood. And in the case of Victor Refining Co. v. City Nat. Bank of Commerce (Tex. Civ. App.) 263 S. W. 622, Justice Boyce, speaking for the court in forcible language, explains the reason why it is against the public policy of this state to accord to the members or stockholders of an association, organized to carry on a business for profit to the same extent and with the same powers as if it were a corporation or joint-stock company, immunity from all the burdens and liabilities of such corporations or companies.

In Louisiana, where at an early date a statute was enacted allowing the formation of partnerships with limited liability of the members similar to our statute of limited partnerships, the Supreme Court has reached the same conclusion. The following is a quotation from the opinion of that court in the case of American National Bank of Shreveport v. Reclamation Oil Producing Association of Louisiana, opinion rendered June 7, 1924, 101 So. 10, from page 11 of the opinion (156 La. 658):

"There is no law in this state which authorizes the association of parties, under the management of trustees, to issue certificates of participation or stock, and to engage in commercial, manufacturing, or other business enterprises. The law does provide the conditions under which persons may conduct such enterprises—by the individual, by corporations legally formed, and by partnerships, which last, according to their objects, are divided into commercial and ordinary. Obviously, the so-called trust agreement does not provide for the conduct of the business contemplated therein by an individual, nor is it pretended that said agreement constitutes a corporation. It merely created an unincorporated private association which is precisely on the same footing as to the liabilities of its members as other partnerships"—citing cases.

The decision of the majority of this court in the McCamey case has been further strengthened by an opinion of the Supreme Court of the United States in the case of Hecht v. Malley, rendered May 12, 1924, 265 U. S. 144, 44 S. Ct. 462, 68 L. Ed. 949, affirming in part and reversing in part (C. C. A. Mass.) Malley v. Howard, 281 F. 363, which reversed a decree (D. C.) Hecht v. Malley, 276 F. 830. The Supreme Court in that case was considering the question of whether or not three so-called "Massachusetts trusts" were "associations" within the purview of an act of Congress known as the Revenue Act of 1916, which imposed special excise taxes upon certain "associations," and also the Revenue Act of 1918, based upon the value of the capital stock of such organizations. The following is a quotation from that opinion:

"Reading together the defining and enacting sections of the act, it is as if section 1,000 (a) provided in terms that: Every corporation, association, joint-stock company, and insurance company, 'created or organized in the United States,' shall pay a special excise tax, as prescribed, with respect to the *carrying on* or doing *business*. And it must be given effect as thus read. * * * We also conclude that these three trusts are '*associations*' created or organized in the United States and engaged in business, within the meaning of the act. * * * The word 'association' appears to be used in the act in its ordinary meaning. It has been defined as a term 'used throughout the United States to signify a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise' [cit-

ing authorities]. * * * We think that the word 'association' as used in the act clearly includes 'Massachusetts trusts' such as those herein involved, having quasi corporate organizations under which they are engaged in carrying on business enterprises. What other form of 'associations,' if any, it includes, we need not, and do not, determine. * * * We do not believe that it was intended that organizations of this character—described as 'associations' by the Massachusetts statutes, and subject to duties and liabilities of such—should be exempt from the excise tax on the privilege of carrying on their business merely because such a *slight measure of control* may be vested in the *beneficiaries* that they might be deemed strict trusts within the rule established by the Massachusetts courts." (All italics ours.)

As shown by the language quoted, the court distinguishes an association organized for the purpose of carrying on business enterprises from a pure trust; and that decision supports the decision of the majority of this court in McCamey v. Hollister Oil Co., supra, and other decisions of our Courts of Civil Appeals cited above, to the effect that the Massachusetts trust is an unincorporated joint-stock company or association within the meaning of articles 6149 to 6153 of our statutes, inclusive, whose members are personally liable for its debts. It is also in accord with the announcement in Cook on Corporations, hereinafter referred to. And it is to be noted further that this case is distinguishable from Crocker v. Malley, 249 U. S. 223, 39 S. Ct. 270, 63 L. Ed. 573, 2 A. L. R. 1601, in that in the latter case the trust there construed was not for the purpose of engaging in an ordinary commercial business; the sole authority of the trustees being to collect rents and income from real estate, with the right to apply to proceeds so collected for the repair and development of the property or for the acquisition of other property pending final distribution of assets, and under the duty to distribute the net proceeds ratably to the holders of stock in the trust.

In Gibson v. Gray, 17 Tex. Civ. App. 646, 43 S. W. 922, it was held that an assignee for the benefit of creditors appointed as such by general deed of assignment, made in conformity with the general assignment statute of the state, was personally liable to a real estate broker for commissions for services rendered by the broker at the instance of the assignee in negotiating the sale of certain real estate belonging to the insolvent debtor. It was further held that, under proper pleadings in the same case, the assignee would be entitled to a decree in his favor that the judgment rendered against him be paid out of funds belonging to the estate of the insolvent debtor, although the court further held that the assignee was a trustee and not an agent of the creditors. But it is to be observed, further, that the creditors did not

execute the assignment and were only beneficiaries of a trust created by the insolvent debtor. And the assignee was not authorized to carry on the business, but merely to wind it up. Furthermore, he was in no sense interested in any of the proceeds. It thus appears that the trust there created was a trust in the true sense of the word.

Likewise the document construed in Connally v. Lyons, 82 Tex. 664, 18 S. W. 799, 27 Am. St. Rep. 935, was a pure trust, and distinguishable from the declaration of trust alleged in plaintiff's petition in this case. As shown in the report of that case, M. A. Connally conveyed to her father, C. P. Connally, as trustee, eight-ninths interest in a stock of merchandise, with directions that he, as such trustee, continue the operation of the mercantile business theretofore conducted by the grantor. It was stipulated that seven-ninths of the profits and proceeds of the business should go to and be apportioned equally between 7 brothers of the grantor, some of whom were minors, but no brother was to receive his share until he reached the age of 25 years, unless the trustee should deem it prudent and to his interest to receive the same before reaching that age. It was held that the brothers were not partners in the business but merely beneficiaries of a trust created for their benefit. It is to be noted that the brothers took no part in the creation of the trust. They did not in any manner undertake to organize the business or to conduct it, except that one of them did conduct it after he was appointed by the court as substitute trustee after the death of the original trustee. Nor did they invest anything in it. They were mere passive beneficiaries of a bounty created by their sister, the donor, and their relation was substantially the same as that of a beneficiary of a spendthrift trust, or a trust of some other character created by will.

As further indicating the public policy of this state, the Legislature has passed the following statutes since most of the decisions of our Courts of Civil Appeals above cited were rendered: Act of the Thirty-Seventh Legislature, c. 73, passed in 1921. Vernon's Civil Statutes, 1922 Supplement (beginning with article 5950½).

Section 1 of that article reads as follows:

"No person or persons shall hereafter carry on or conduct or transact business in this state under any assumed name * * * other than the real name or names of the individual or individuals conducting or transacting such business unless such person or persons shall file in the office of the clerk of the county or counties in which such person or persons conduct, or transact or intend to conduct or transact such business, a certificate setting forth [1] the name under which such business is or is to be, conducted or transacted, and [2] the true or real full name or names of the person or persons conducting or transacting the same, with

the post office address or addresses of said person or persons."

Section 3 of the act (article 5950½b) provides that persons withdrawing from said business, or disposing of their interest therein, shall likewise file in the office of the county clerk a certificate certifying such withdrawal or disposition of interest.

And section 6 of the act (Vernon's Ann. Penn. Code Supp. 1922, art. 1007c) provides that any person owning, carrying on, conducting, or transacting any business, who shall fail to comply with the provisions of the act, shall be guilty of a misdemeanor, and, upon conviction, punished by fine of not less than $25 nor more than $100 for each and every day the statute is violated.

Also an act approved June 4, 1923, shown in chapter 52 of the First, Second, and Third Called Sessions of the Thirty-Eighth Legislature and known as the Blue Sky Law, providing that every "person," "company," "concern," or "individual," who may issue stock or any certificate evidencing ownership or membership in any corporation, joint-stock association, common-law trust, or any other organization or concern of whatsoever nature, designed to own property of any character, shall, before offering such stock for sale through agents or otherwise, procure permit therefor from the secretary of state. And in order to procure such permit an application must be filed showing the name and general purpose of the business, occupation and general qualifications of trustees or managing officers, the business which such trustees or officers have followed in the last 5 years, a copy of the articles of association, partnership agreement, or any other contract or agreement under which the business is to be transacted, the counties in which the instruments are filed, capital stock and par value thereof, price at which same is to be sold, amount to be issued for promotion, the assets and liabilities of the issuer, etc., and the secretary of state is given the discretion to grant or refuse the permit requested.

Section 27 of the act provides that any person violating the provisions of the act shall be subject to fine of not less than $1,000 nor more than $10,000, and in addition thereto may be imprisoned in the state penitentiary for a period of not less than one year nor more than five years.

In Cook on Corporations (8th Ed.) beginning on page 2239, the author traces the history of what is now commonly known as the Massachusetts trust, and shows that the use of that form of organization began in England over 200 years ago; that it was first adopted in Massachusetts about 100 years ago, and has been there used ever since as a means of accomplishing the same advantages enjoyed by a corporation, with the same immunity from liability of the stockholders, and at the same time escape the burdens imposed by statutes on corporations in the matter of taxes, penal statutes, statutory restrictions on foreign corporations doing business in the state, etc.; and, after stating that such organizations are not corporations or ordinary partnerships or statutory joint-stock companies, the author further says (page 2251):

"What then are these Massachusetts trusts? In order to understand them it is necessary to divide them into two classes: First, where the trustees merely invest and collect dividends or interest or rental (from a single lease) and distribute the same among the shareholders. The Supreme Court holds that these are simple common-law trusteeships, the same as where a trustee under a will collects income and distributes it among the beneficiaries. The English authorities are to the same effect. Lord Halsbury says: 'If * * * persons between whom no contractual relation exists subscribe to a fund to be invested in the shares of companies by trustees for the subscribers, the subscribers do not carry on a business, and probably the trustees * * * do not either.' In this class of Massachusetts trusts the shareholders are not liable for the debts, and the trust is exempt from certain taxes. Second, where the trustees carry on an active business for profit. These are simply unincorporated joint-stock associations.

"These two lines of decisions probably mark the true line of distinction. Certainly those who carry on an active business for profit, through others, are principals and not mere beneficiaries, irrespective of how much or how little power of management and control they exercise, actually or by the terms of the original agreement. A silent participant in the profits of a business concern is liable for its debts, even though he take no part in its management. The theory that these trusts should be divided according to whether the shareholders exercise great or little powers of control is only confusing. The trust instrument may be drawn either way. An investment trust agreement may give practically large powers to the shareholders, or a business trust agreement may give practically all powers to the trustees—a premium on irresponsibility. The real test is whether the shareholders or trustees or both combined carry on business; if so they are a business trust, with liability for debts and taxes. Practically the courts apply this test now. A Massachusetts trust in active day by day mercantile or manufacturing or real estate business is far removed from a trusteeship to cut coupons, or collect dividends, or a fixed rental, and distribute the same, as under a will. The distinction based on shareholders' powers might be abandoned. As a matter of fact, the shareholders exercise little actual control in any of these trusts, or in statutory joint-stock companies, or even in full corporations."

[7] To hold that a number of persons may associate themselves together for the purpose of transacting the ordinary business of the country for the joint benefit of all persons concerned therein, and may reap those benefits at the expense of a creditor, who is not a member of the association and in no sense

a party to the contract under which it is organized, simply by operating under a Massachusetts trust agreement, would certainly be contrary to every principle of justice and fair dealing.

In Sergeant v. Goldsmith Dry Goods Co., 110 Tex. 482, 221 S. W. 259, 10 A. L. R. 742, it appears that the Commercial Underwriters of San Antonio was a voluntary unincorporated association for the protection of its members against loss by fire. The association was not formed for the pursuit of a business for profit, but was for the mutual advantage of those becoming members, called subscribers, whereby they might obtain fire insurance at a low premium rate. The general supervision of the business was in the hands of a committee annually elected. The conduct of the business was in the hands of a manager. The suit was in part by creditors of the association, acting through their trustees, and the question of the liability of the members to the creditors was the principal question involved in the suit. In disposing of the case, Chief Justice Phillips had this to say:

"It is plain that the members of the association did not constitute a partnership. The concern had none of the elements of a partnership. There was no joint undertaking, no common business. The policies of insurance were not issuable to the public. The business of the association was intimate to only those who as members composed it. Its purpose was merely their mutual protection against fire losses by a scheme of mutual insurance, and their limited liability for such losses was expressly made several and not joint. The object of the concern was not profit. There was to be no community of either profits or losses. There was no holding out of the members as partners. The concern had no being except in those who were members of it. It was not tangible except as they were tangible. As to third persons, they are therefore liable as other principals are liable who deal with third persons through any form of agency. As between themselves, they are liable as their contracts with each other make them liable. That is the whole of the case on the questions presented. In the language of an eminent author, it is a mere misuse of words to call such an association a partnership. 1 Lindley on Partnership (2d Am. Ed.) p. 50; 1 Collyer on Partnership, p. 47; Wrightington on Unincorporated Associations, § 54, at pages 200–202; Niblack on Benefit Societies, § 80; Burt v. Lathrop, 52 Mich. 106, 17 N. W. 716; Brown v. Stoerkel, 74 Mich. 269, 41 N. W. 921; Branagan v. Buckman, 122 N. Y. Supp. 610; Meinhart v. Draper, 133 Mo. App. 50, 112 S. W. 709.

"As to third persons dealing with the association and to whom it incurred lawful debts contracted within the powers of whatever agency it employed, that is, claimants falling within the second and third classes, the members of the association, as before stated, are jointly and severally liable as principals. They could not create an organization, give it a name, invite others to sell it supplies or render it

272 S.W.—22

services, for instance, for their benefit, and not as principals be liable for such debts. The association was a fiction except as the members stood behind it. They are necessarily liable for debts to third persons incurred in carrying out the purposes for which they were associated. They were the association. Such transactions inured to their joint and several benefit. They should in the same measure pay what is owing upon them. Lewis v. Tilton, 64 Iowa, 220, 52 Am. Rep. 436, 19 N. W. 911; Davison v. Holden, 55 Conn. 103, 3 Am. St. Rep. 40, 10 Atl. 515; Willcox v. Arnold, 162 Mass. 577, 39 N. E. 414."

What was there said applies to cases like this with added force, by reason of the fact that the association is organized for the purpose of profit to all parties, including trustees and holders of certificates of stock.

The different and confusing conceptions of the law upon the subject of the Massachusetts trust, as evidenced by the many decisions of courts of different states, and in discussions by text-writers throughout the country, is our apology for this extended discussion.

For the reasons indicated, the majority of this court are of the opinion that the motion for rehearing should be granted, and that the judgment of the trial court should be reversed, and the cause remanded, and it is so ordered.

BUCK, J. (dissenting). The writer does not construe the holding in Connally v. Lyons, 82 Tex. 664, 18 S. W. 799, 27 Am. St. Rep. 935, as does Justice DUNKLIN. In the writer's judgment the facts there shown put the beneficiaries practically in the same position as that occupied by the so-called stockholders in the instant case. M. A. T. Connally, on February 25, 1875, executed a trust for the benefit of her father, C. P. Connally, and her 7 brothers, some of whom at the time of such execution were grown, some minors. She divided her property, consisting of a going business in the town of Sulphur Springs, the building in which the business was conducted, etc., into 9 equal portions, and conveyed one of said portions to her father and one to each of her brothers, retaining the title to one portion in herself. She appointed her father, C. P. Connally, trustee to manage said business. She provided in this declaration of trust that the property should be kept intact until her youngest brother was 25 years of age, or, if he should die before he reached said age, then until he would have become 25 years old had he lived. She further provided that at the expiration of the period of said trust, her father, as said trustee, should pay to each of said brothers his pro rata part of the trust estate; and the trustee was authorized, upon a certain specified condition, when any brother should reach 25 years of age, to pay him his pro rata part. C. P. Connally accepted the trust and conducted the business

and managed the trust estate until his death, probably in 1882. On March 24th of that year, and after the death of C. P. Connally, the district court, "all parties at interest being before the court," assumed jurisdiction and appointed one of the brothers, Nathan Connally, as trustee. He accepted the trust and conducted the business and managed the trust estate until January 20, 1886, when some of the creditors of Connally & Co., owned by the trust estate, filed an attachment for debt. The debts of the estate amounted to more than $11,000 above the assets. Suit was filed against Nathan Connally to hold him personally liable for certain goods sold to the firm of Connally & Co. The Supreme Court held him liable. The court said:

"Mere participation in profits does not constitute partnership, although there should be a contract from* which they were derived. Buzard v. Bank, 67 Texas, 89. There was no contract of partnership in this case. The defendant Nathan Connally acted as trustee under an appointment from the court, and had the entire control and sole management of the business. There was no right of control whatever reserved in the instrument executed by M. A. T. Connally to her father C. P. Connally, as trustee, either for herself or for the beneficiaries as such. A test of partnership is the right of control over the property or profits, or to make disposition thereof. 1 Bates on Partnership, § 37. There was no right whatever in the brothers of the grantor, who were beneficiaries therein, either to control or withdraw their several interests. From the terms of the instrument the business was to be conducted until the youngest was 25 years of age, or, if he died before that time, to such a time as he would have been 25 if he had lived. We must also infer that at least some of the beneficiaries were minors, and it will not be contended that they could be partners, although the instrument might indicate a partnership. The finding of the court is further strengthened by the fact that there is no statement of facts brought up with the record, and there may have been proof of other facts to sustain his conclusion that Nathan Connally was the trustee of a trust estate. We think, however, that a proper construction of the instrument alone would lead to the same conclusion. There was no evidence to make the beneficiaries partners by holding out, but such a partner would not be a necessary party."

The business mentioned in the declaration of trust in the Connally Case, of which defendant was a trustee, was a business for profit. The writer is unable to see why the beneficiaries thereunder, who accepted the benefits to be derived from the conduct of the business, some of whom, at least, were evidently adults, should be protected from liability, while, as in this case, the beneficiaries, shareholders we may call them for the sake of argument, who had no part in the conduct of the business, nor in the election or control of the trustees, who, as shown in our original opinion, were self-elected and self-perpetuating, should be held liable. See Fink v. Brown, 215 S. W. 846, 847, by the Commission of Appeals, approved by the Supreme Court. In that case Cudahy Packing Co. v. Hibou, by the Mississippi Supreme Court (92 Miss. 234, 46 So. 73, 18 L. R. A. [N. S.] pp. 975, 1079), was cited, and it was held that a participation in the net profits of a business or undertaking did not make such parties so participating partners, and cited also Connally v. Lyons, supra. The Mississippi case, as reported in 18 L. R. A. (N. S.), has voluminous notes and citations, which see. Nor is it sufficient to show that parties in an adventure or business share in the gross profits. H. & T. C. Ry. Co. v. McFadden & Bro., 91 Tex. 194, 40 S. W. 216, 42 S. W. 593; Buzard v. Bank, 67 Tex. 89, 2 S. W. 54, 60 Am. Rep. 7; Beecher v. Bush, 45 Mich. 188, 7 N. W. 785, 40 Am. Rep. 465; 39 Cyc. p. 333. Since plaintiff below pleaded the declaration of trust, and cited the volume and page of the deed records of Stephens county in which it was recorded, and made the declaration a part of his petition, if in fact it did not know at the time it furnished the goods, and took the note therefore signed by the alleged officer of the Man O'War Oil Syndicate, that the goods were being furnished to an association under a declaration of trust, the writer thinks such fact should have been pleaded, and, in the absence of such plea, that in support of the judgment it should be presumed that it did know such fact. The writer is of the opinion that a court might take judicial cognizance of the general practice in Texas, at least, of those forming an association to operate under a declaration of trust to file such declarations in the deed records of the county of the association's domicile, and in the counties where they are operating, and that, in view of that general practice, one extending credit to the trustees of the association, or to the association itself, ought to be charged with notice of that general practice, and thereby is charged with the duty of examining the records to determine the limitations provided in such declaration of the terms thereof, and the limitations of liability on the part of the shareholders or beneficiaries.

If it knew such fact, and with such knowledge furnished the goods, the writer believes it would be precluded, in any event, from asserting a liability against the holders of these units of stock. Dayle L. Smith Oil Co. v. Continental Supply Co., by the San Antonio Court of Civil Appeals, 268 S. W. 489, and authorities there cited; Collier on Partnerships, p. 24, citing Warner v. Beers, 23 Wend. (N. Y.) 150. See Victor Refining Co. v. City National Bank, 263 S. W. 622, by the Amarillo Court of Civil Appeals, apparently contra, writ of error granted.

In 7 A. L. R. p. 613 and following, there is

a full discussion of the holding of the courts of different jurisdictions as to the liability of trustees and of shareholders, in the so-called "Massachusetts trust." The statement is made that in a considerable number of cases in the different jurisdictions the courts have apparently expressly or impliedly upheld the validity of such trusts, and there are cited a number of cases from the United States courts, the courts of Illinois, Iowa, Massachusetts, New York, Ohio, Pennsylvania, Texas (including the case of Connally v. Lyons, supra), and England.

In a recent paper, read before the Texas Bar Association, by Professor Hildebrand of the law department of the University of Texas, and published in the February number, 1923, of the Texas Law Review, and in the January and February number, 1925, of the American Law Review, Professor Hildebrand discusses at length the nature and character of the "Masschusetts trust." He cites the cases of McCarthy v. Parker (1923) 243 Mass. 465, 138 N. E. 8, in which the Supreme Court of Massachusetts held that, if a creditor knew at the time he extended the credit to such trust that the trustees had no power to bind the shareholders personally, and all persons, associations, or corporations extending credit to, contracting with, or having any claim against, the trustees should look only to the funds or property of the association for payment, and even though at the time of the suit the company was insolvent, that the plaintiff could not recover against the shareholders as partners. See Hussey v. Arnold, 185 Mass. 202, 70 N. E. 87; William Cameron Co. v. First National Bank, 4 Tex. Civ. App. 309, 23 S. W. 334; Willis v. Greiner (Tex. Civ. App.) 26 S. W. 858; Buford v. Lewis, 87 Ark. 418, 112 S. W. 963; Meehan v. Valentine, 145 U. S. 611, 12 S. Ct. 972, 36 L. Ed. 835; Shackelford v. Williams, 182 Ala. 87, 62 So. 54; Feighenspan v. McDonnell, 201 Mass. 341, 87 N. E. 624; First Nat. Bank v. Stadden, 103 Minn. 403, 115 N. W. 198.

From the above authorities, and many others that might be cited, it seems fairly well settled that a third party dealing with a joint-stock company or a partnership is bound by known limitations of the authority of a partner or any agent of the firm, and of the known limitations as to liability of a stockholder. In the recent case of Betts v. Hackathorn, 159 Ark. 621, 252 S. W. 602, 31 A. L. R. 847, the Supreme Court of Arkansas held that the shareholders are not liable at all for any of the debts incurred by the trustees if the company is a pure trust. The writer agrees with this holding where the creditor-plaintiff knew at the time he extended the credit of the limitation of liability as against the shareholder.

But the writer will not extend this dissent further, and will merely discuss one of the statements contained in the majority opinion, on the motion for rehearing. Justice DUNKLIN refers to the Act of the Thirty-Seventh Legislature, c. 73, 1922 Supplement, beginning with article 5950½. This act was passed by the Legislature in 1921, and was presented to the Governor of Texas for his approval on March 12, 1921, but was not signed by him nor returned to the house in which it originated, and became effective 90 days after adjournment, which was on March 12, 1921. The pleading of plaintiff shows that the note sued on was given May 12, 1921. Hence the act quoted in the majority opinion was not effective at the time of the creation of the obligation sued on in this case.

The writer believes that the judgment below should be affirmed, as expressed in our original opinion.